IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR NO. 14-00032 DKW |
| Plaintiff, | |
| | ORDER DENYING DEFENDANT |
| vs. | TOYOFUKU'S MOTION TO |
| | SUPPRESS |
| JOHN ZACHARY KATSU TOYOFUKU, | |
| Defendant. | |

**ORDER DENYING DEFENDANT TOYOFUKU'S
MOTION TO SUPPRESS**

At issue in this motion to suppress is whether two individuals, who referred to themselves on the date of the incident as "marshals of the Kingdom of Atooi," were acting privately or as "government actors" when they opened a crate containing marijuana without a warrant, ultimately leading to the arrest of Defendant John Zachary Katsu Toyofuku.  Toyofuku is charged with knowingly and intentionally attempting to possess with the intent to distribute fifty (50) kilograms or more of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Dkt. No. 33.

Toyofuku moves to suppress all evidence that the government obtained as a result of the warrantless, allegedly illegal search and seizure conducted by the Atooi marshals.  Dkt. No. 55.

The Court concludes that because the two Atooi marshals were acting as private individuals when they opened the crate and box containing marijuana, their search did not violate the Fourth Amendment.  The Court further concludes that Toyofuku thereafter voluntarily made incriminating statements to law enforcement and that the search of his cell phone occurred with his express consent.  Lastly, the Court concludes that both the Drug Enforcement Administration's ("DEA") further search of the crate and search of Toyofuku's residence were conducted pursuant to validly issued search warrants.  Accordingly, the Court DENIES Toyofuku's Motion to Suppress (Dkt. No. 55).

## **BACKGROUND**

Toyofuku's Motion to Suppress came on for hearing before this Court on August 24, 2015, September 8, 2015, and September 11, 2015.  Three witnesses testified:  Federal Bureau of Investigation ("FBI") Special Agent Timothy Pent, Honolulu Police Department ("HPD") Officer Darren Lee, and Samson Kama. The witnesses presented testimony relating to a series of events that occurred on June 7, 2013, beginning with an unscheduled meeting between Special Agent Pent and two Atooi marshals, including Mr. Kama, who were responsible for

2

discovering a crate containing marijuana that afternoon.  The discovery of this

marijuana ultimately led to the arrest of Toyofuku.

      In carefully assessing the testimony of the witnesses, including the substance

of the testimony as well as the demeanor and manner in which the witnesses

testified, the Court finds the testimony of Special Agent Pent, Officer Lee, and Mr.

Kama to be credible and consistent with the other evidence in the record as to

material details.  The one portion of Mr. Kama's testimony to which the Court

does not give full credence is the portion in which he testified that he did not

personally open the crate containing marijuana.  Other contemporaneous and more

credible evidence in the record contradicts Mr. Kama on this point.  Resolution of

this discrepancy, however, is not essential to the Court's analysis.  All other

material facts do not appear to be in dispute.

      Based upon its review of the evidence and the testimony presented at the

hearing, the Court finds the following facts supported by the record.

## I.   Kingdom of Atooi Marshals' Introductory Meeting With Special Agent Pent

      On June 7, 2013, Special Agent Pent was assigned as the complaint duty

agent for the FBI's Honolulu Division office located in Kapolei, Oahu, Hawai'i.

The complaint duty agent receives calls regarding new or unassigned criminal

complaints, and meets in person with anyone walking into the FBI office who

requests a meeting with an agent.   That morning, two individuals, Messrs. Kama

3

and Kimokeo Kahalewai,[1] identifying themselves as part of the Kingdom of Atooi,

went to the FBI office and requested a meeting with the FBI Special Agent-in-

Charge ("SAC").  Upon receiving this information from the command center,

Special Agent Pent, in his capacity as complaint duty agent, met with Messrs.

Kama and Kahalewai in front of the metal detectors just outside of the FBI security

checkpoint.  Special Agent Pent did not, at any time, invite the two men through

security or into the FBI building itself.

Messrs. Kama and Kahalewai identified themselves to Special Agent Pent as

"marshals of the Kingdom of Atooi."  Although Messrs. Kama and Kahalewai had

requested a meeting with the SAC, Special Agent Pent explained to them that such

an impromptu, unscheduled meeting was not possible, but that he would be "happy

to talk to them."  Special Agent Pent then engaged in a "cordial, friendly

conversation" with the Atooi marshals that lasted approximately ten minutes.

Because Special Agent Pent was unfamiliar with the Kingdom of Atooi, he

first asked them to explain.  According to Mr. Kama, the Kingdom of Atooi is a

Polynesian sovereignty group, and the marshals of the Kingdom of Atooi are the

law enforcement arm of the Kingdom at the federal level.  Messrs. Kama and

Kahalewai expressed their desire to "liaison" with the FBI.  It is undisputed that

this was the first time that Messrs. Kama and Kahalewai met, or attempted to meet,

---

[1] Mr. Kahalewai is also known as "Timothy Troxell" and "Papa T."  For purposes of this order, the Court refers to him as "Mr. Kahalewai."

with someone from the FBI.  Mr. Kama testified that the meeting was "[j]ust for introduction" and that their "main goal" was to "[j]ust introduce [themselves]."

Mr. Kahalewai showed Special Agent Pent a badge, which displays the words "Hawaii Federal Marshal."  Government Exhibit ("Exh.") 1.  The middle of the badge contains a circular seal, which displays the words "The Polynesian Kingdom of Atooi" around the perimeter and depicts a man and a woman dressed in what appears to be traditional Polynesian attire in the center.  Exh. 1.

Special Agent Pent recognized, based on this conversation, that Messrs. Kama and Kahalewai wanted to build a relationship with the FBI.  Because Special Agent Pent had no knowledge or indication that Messrs. Kama and Kahalewai were actually using the badge or otherwise holding themselves out as law enforcement, he did not instruct them that "you're not law enforcement" or warn them that "impersonating a police officer or a federal agent is a crime."  The two men, for instance, did not mention to Special Agent Pent that they were working on any investigation generally, that they were doing any type of drug investigation specifically, or that they had an interest in searching vehicles for contraband or seizing marijuana.  Neither the name "John Toyofuku" nor the name of any other specific individual arose during the conversation.

Special Agent Pent concluded the conversation by shaking the two men's hands, giving them his card, and telling them in a polite and cordial manner that

they could call him if they had any information in which the FBI might be interested.  Mr. Kama left feeling like the meeting had gone well and that they had accomplished their goal.

## II.    Discovery of the Crate Containing Marijuana

Later that same afternoon, June 7, 2013, Messrs. Kama and Kahalewai received a call from one of their Atooi citizens, Clint Christiansen, a driver for Express Movers, that he was being followed.  Messrs. Kama and Kahalewai arranged to meet Mr. Christiansen in Kunia.  Mr. Kama testified that when they arrived, their primary concern was the safety of both Mr. Christiansen and themselves.  At some point, the crate in Mr. Christiansen's delivery truck was opened.  It is unclear whether Mr. Kama, Mr. Kahalewai, and/or Mr. Christiansen opened the crate.  But it is clear that at least one of them did, and it is undisputed that they did so without any input or direction from state or federal law enforcement authorities.

The crate contained six cardboard boxes.   Messrs. Kama and/or Kahalewai opened one of the cardboard boxes and discovered marijuana.  After observing marijuana in the opened box, Mr. Kama called Special Agent Pent and notified him of the crate containing marijuana.  Mr. Kama also called and left messages with several other law enforcement agencies, including HPD and DEA.  To verify the information, Special Agent Pent asked Mr. Kama to text him a photo of the crate

6

and its contents.  Special Agent Pent recognized the contents of the opened box to

be marijuana.

 After reviewing the photo, Special Agent Pent contacted Mr. Kama for

further details.  Mr. Kama explained that they received a tip from the driver of an

Express Movers truck, who also happened to be a citizen of the Kingdom of Atooi.

The driver had observed what he thought to be suspicious activity when he initially

attempted to deliver the crate, which led him to believe that the crate contained

illegal drugs.  Mr. Kama then asked Special Agent Pent whether he should detain

the individual who initially came to pick up the crate.  Special Agent Pent

responded that he should not take any further action until law enforcement

personnel arrived.  Special Agent Pent then communicated the information to the

FBI and to HPD officers with the High Intensity Drug Trafficking Area program.

Special Agent Pent told Mr. Kama that an officer would be arriving soon.  Mr.

Kama then informed Special Agent Pent that DEA Special Agent Richard Jones

was already on scene in Kunia.

## III.    <u>Seizure of Crate by DEA at Royal Kunia Country Club</u>

 Approximately two hours after Messrs. Kama and Kahalewai arrived at the

Royal Kunia Country Club in Kunia, several law enforcement officers arrived,

including Special Agent Jones and Officer Lee.  Officer Lee testified that when he

approached Mr. Kama, he initially thought Mr. Kama was a Deputy United States

Marshal because his lieutenant had told him that "there were marshals there who had seized a crate of drugs – of marijuana." However, when he exchanged credentials with Mr. Kama, Officer Lee noticed that the shape of the badge did not resemble that of a United States Marshal. One of the other officers pointed at the license plate of the truck that Messrs. Kama and Kahalewai were driving, which displayed a Hawaiian sovereignty license plate. Mr. Kama explained to Officer Lee that he was a marshal for the Kingdom of Atooi, not a United States Marshal. Officer Lee also spoke with the driver of the truck, Mr. Christiansen. Mr. Christiansen explained that he had attempted to deliver the crate to an address in Manoa. An individual named "Taylor" arrived in a U-Haul van to pick up the crate. Because the hydraulic lift in the back of the delivery truck was broken, Mr. Christiansen was unable to transport the crate from his truck to the U-Haul van, and Taylor refused to allow Mr. Christiansen to open the crate to attempt to deliver the contents only.

Special Agent Jones then seized the wooden crate, the marijuana inside the opened box, and the five unopened cardboard boxes remaining inside the crate. Special Agent Jones loaded the wooden crate and its contents onto his truck and drove the truck to a DEA storage warehouse.

## IV.    **Controlled Delivery**

While en route to the DEA warehouse, Special Agent Jones, posing as an employee for the shipping company, called the delivery recipient contact number and spoke with "Barbara."  Barbara claimed that the crate contained antique furniture, and thus, it could only be opened by professional "de-craters."  Barbara explained that a person named "Taylor" would contact Special Agent Jones to arrange a delivery location.  Taylor called Special Agent Jones and asked that the shipment be delivered to the original delivery location in Manoa.

DEA agents and plain clothes HPD officers held a briefing in Manoa.  The law enforcement officers were advised to watch for a U-Haul truck.  After arriving at the designated delivery location for the crate, the officers observed a U-Haul truck on Kalawao Street in Manoa.  The officers also observed Toyofuku near the truck and identified themselves as law enforcement.  Officer Lee testified that he asked Toyofuku, "What are you doing?"  When Toyofuku responded that he was there to pick up a crate, officers arrested him and advised him of his *Miranda* rights.

Officer Lee led Toyofuku to his undercover vehicle and patted him down prior to Toyofuku entering the passenger front seat of the vehicle.  The officers did not handcuff Toyofuku.  Although advised of his *Miranda* rights, Toyofuku agreed to speak with the officers without an attorney.  Officer Lee recalled Toyofuku

9

saying "that he was there to pick up a crate, the crate was supposed to contain a lot of drugs, and he was on some sort of suicide mission; and if he didn't do it, he would be in a lot of trouble."  Special Agent Jones then approached the vehicle and asked Toyofuku if he had a cell phone on him and if he could look through the phone.  According to Officer Lee, Toyofuku responded, "Yes, it's all right," and was cooperative.  Upon inspection, the officers recognized that Toyofuku's phone was the one used to arrange for the delivery of the crate to the Manoa location.

## V.   <u>Search Warrants</u>

On June 10, 2013, U.S. Magistrate Judge Richard Puglisi issued a search warrant, authorizing the search of the five unopened cardboard boxes that were seized with the crate on June 7, 2013 in Kunia.  Agents discovered approximately 150 heat-sealed baggies containing approximately 162 pounds of marijuana.

On June 12, 2013, Special Agent Jones obtained a search warrant from U.S. Magistrate Judge Puglisi to search Toyofuku's residence.  Agents seized a number of items from inside Toyofuku's apartment pursuant to the search warrant, including rolling papers, a money counter, and documents the government describes as "drug records."

## <u>DISCUSSION</u>

Toyofuku moves to suppress all evidence that the government seized as a result of a warrantless, allegedly illegal search and seizure by the Atooi marshals

10

on June 7, 2013.[2]  Dkt. No. 55 at 1-2.  In addition, Toyofuku moves to suppress all evidence directly or indirectly resulting from the Atooi marshals' seizure, including, pursuant to *Riley v. California*, 134 S. Ct. 2473 (2014), from the warrantless search of his cellular phone.  Dkt. No. 55 at 2.

Toyofuku's motion primarily concerns whether the Atooi marshals, Messrs. Kama and Kahalewai, were "government actors" for purposes of the Fourth Amendment when they opened the crate, and one of the boxes in the crate, that contained marijuana.  After careful consideration of the evidence, the authority and arguments presented, the Court concludes that the search conducted by the Atooi marshals was a private search, and thus, did not violate the Fourth Amendment. The Court further concludes that the search of Toyofuku's cell phone occurred with Toyofuku's consent.  Accordingly, the Court DENIES Toyofuku's Motion to Suppress.

## I.   The Search of the Crate and its Contents By the Kingdom of Atooi Marshals Did Not Violate the Fourth Amendment

The Fourth Amendment applies only to searches and seizures that are the product of government action.  *Walter v. United States*, 447 U.S. 649 (1980). While ordinarily, a search conducted by a private party does not implicate the

---

[2]Specifically, this evidence includes "the marijuana upon which the charge against Mr. Toyofuku is based, statements Mr. Toyofuku made after being arrested, evidence seized from his person and the U-Haul truck he was driving at the time of his arrest, and all derivative evidence seized from his residence."  Dkt. No. 55 at 1-2.

11

Fourth Amendment, Fourth Amendment interests are implicated where the same

individual acts as an instrument or agent of the government.  *United States v.*

*Jacobsen*, 466 U.S. 109, 115 (1984). *Coolidge v. New Hampshire*, 403 U.S. 443,

487 (1971).  To determine whether a private party's search implicates the Fourth

Amendment, courts consider two critical factors:  "(1) whether the government

knew of and acquiesced in the intrusive conduct; and (2) whether the party

performing the search intended to assist law enforcement efforts or further his own

ends." *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (quoting *United*

*States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)).  When challenging such a

search, the defendant bears the burden of establishing both prongs.  *See United*

*States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994).

## A.   <u>The Atooi Marshals Intended to Assist Law Enforcement</u>

The Court first addresses whether the Atooi marshals "intended to assist law

enforcement efforts or further [their] own ends."  *Reed*, 15 F.3d at 931.  Mr. Kama

testified that his primary goal when he and Mr. Kahalewai met with Mr.

Christiansen was the safety of Mr. Christiansen, who felt that he was "being

followed."  Mr. Kama's secondary goal was "to do the right thing."  Mr. Kama

explained that after discovering marijuana in the crate, he contacted various federal

and local law enforcement agencies with responsibility over drug crimes.  As a

result, although perhaps a secondary goal, the Court finds that the Atooi marshals

intended to assist law enforcement when they, together with Mr. Christiansen, opened the crate and cut open one of the boxes inside the crate.

The record reflects that Mr. Christiansen believed the crate contained illegal drugs based on what he described to Officer Lee as suspicious activity that he had observed when he attempted to deliver the crate.  Mr. Christiansen communicated this information to the Atooi marshals, who arranged to meet Mr. Christiansen at Royal Kunia Country Club.  Although Mr. Kama testified that the safety of Mr. Christiansen was his primary concern, that goal would have been achieved once he and Mr. Kahalewai arrived on scene and met with Mr. Christiansen without anyone else present or apparently following.  With the safety goal in the rear view mirror, Mr. Kama and/or Mr. Kahalewai nonetheless proceeded to cut open one of the boxes and observed what appeared to be marijuana.  The Court finds that the intent behind the search of the crate was motivated, at least in part, by the Atooi marshals' desire to further law enforcement ends.

### B.    The Government Did Not Know Of or Acquiesce In the Atooi Marshals' Search Of the Crate

The Court next addresses the more difficult question of "whether the government knew of and acquiesced in the intrusive conduct[.]"  *Reed*, 15 F.3d at 931.  "It is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is unconstitutionally forbidden to accomplish."  *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  In other words, "[p]olice officers

13

may not avoid the requirements of the Fourth Amendment by inducing, coercing, promoting, or encouraging private parties to perform searches they would not otherwise perform." *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014). Police officers may be liable for a private party's search when the police "ordered or were complicit in the search[]." *United States v. Sparks*, 265 F.3d 825, 831 (9th Cir. 2001).

Here, it is undisputed that state and federal law enforcement authorities did not conduct a warrantless search of the crate themselves; that state and federal law enforcement did not direct the Atooi marshals to conduct the warrantless search of the crate; and that state and federal law enforcement did not have actual knowledge of the warrantless search of the crate prior to or while it was occurring. Indeed, when Special Agent Pent initially met with Messrs. Kama and Kahalewai on the morning of June 7, 2013, the Atooi marshals did not convey any information or sign that an ongoing investigation of any kind was taking place. They did not mention any investigation, any drug investigation, Mr. Christiansen, Mr. Toyofuku or anyone else at that time. In fact, from the testimony, it appears that even the Atooi marshals had no inkling of the circumstances leading to the marijuana in this case until sometime later that afternoon well after their meeting with Special Agent Pent had concluded. As such, it is clear that the government did not "know of" the

14

intrusive conduct, *i.e.*, the warrantless search of the crate, until after it had taken place.[3]

Toyofuku contends that even though the government did not have advanced knowledge of the search and did not direct the search, Special Agent Pent's actions when he initially met with the Atooi marshals amounted to "acquiescence," converting the Atooi marshals into government actors.  In support, Toyofuku relies on the Ninth Circuit's inclusion of "willful blindness" within the definition of "acquiescence" in *Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003).  Dkt. No. 79 at 5-6.  Even considering "willful blindness," however, Special Agent Pent's conduct did not amount to "acquiescence."

The parties do not appear to dispute the material facts surrounding the exchange between Special Agent Pent and the Atooi marshals, but rather, the legal significance of certain facts or omissions.  Specifically, Toyofuku highlights the fact that Messrs. Kama and Kahalewai identified themselves as marshals, that they showed Special Agent Pent what appeared to be a "real badge," and that they told Special Agent Pent that they wanted to liaison with the FBI.  Given these facts, Toyofuku contends that Special Agent Pent had an affirmative duty to discourage

---

[3]The record also reflects that the only contact that the Atooi marshals had with law enforcement prior to the search at issue is the ten-minute meeting with Special Agent Pent outside of the FBI building on the morning of June 7, 2013.  Other than this meeting, there is no evidence of the Atooi marshals having any relationship or prior history with the FBI or any other law enforcement agency.

Messrs. Kama and Kahalewai from engaging in any type of law enforcement activity. Toyofuku challenges Special Agent Pent's explanation as to why he did not inform the Atooi marshals that impersonating a law enforcement officer is against the law after they showed him a badge. Special Agent Pent testified: "Because at that point I had no knowledge that they were using that fictitious badge that they were showing me to do any activity of that sort." Toyofuku argues that "it would have taken an extraordinary amount of *willful blindness* . . . to respond by saying absolutely nothing to dissuade the use of the badge or law enforcement action, but rather to provide his own credentials by giving them his card and inviting them to contact him if they had any information of criminal activity." Dkt. No. 79 at 7.

After careful consideration of the evidence and arguments presented, the Court cannot conclude that Special Agent Pent had an obligation to take affirmative action, *i.e.*, discourage the Atooi marshals from engaging in law enforcement activity at this ten-minute introductory meeting. Although the Atooi marshals showed Special Agent Pent a badge and notified him that they wanted to form a "relationship" with the FBI, they did not inform Special Agent Pent that they had engaged in or intended to engage in law enforcement activity, such as conducting searches, gathering evidence, or making arrests. Nor did they inform Special Agent Pent about anything specifically related to the search at issue. As

16

such, Special Agent Pent received no information about any general or specific law enforcement activity that the Atooi marshals had engaged in or intended to engage in. Under these circumstances, it was not "willful blindness" on Special Agent Pent's part to simply conclude the conversation in a cordial way by shaking the Atooi marshals' hands and informing them, just as he would any other member of the general public, that they could contact him if they had any information regarding criminal activity.

Toyofuku contends that "[a]ffirmative discouragement is required to honor the Fourth amendment when private actors demonstrate significant entitlement to law enforcement functions." Dkt. No. 79 at 5. Relying on *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981), Toyofuku contends that some type of discouragement was required by Special Agent Pent under the circumstances of this case. The Court recognizes that in *Walther*, the Ninth Circuit relied, in part, on the lack of discouragement by the DEA in holding an airline employee an "instrument or agent" of the government. *See Walther*, 652 F.2d at 793. However, several salient facts in *Walther* are materially distinguishable or absent from the instant case, facts that were crucial to the *Walther* court's holding.

In *Walther*, an airline employee and former DEA informant, Hank Rivard, opened up a Speed Pak containing drugs, which led to the arrest of the defendant, Karyn Walther. *Id.* at 790. Rivard had worked as an informant for the DEA in the

17

past for several years, but his informant file closed without his knowledge when he was on a leave of absence from the airline for which he worked. *Id.* Even after his informant file had closed, Rivard would still open Speed Paks and frequently discovered illegal drugs. *Id.* "Following a suppression hearing on Walther's motion, the district court found that at the time Rivard opened the Speed Pak at issue and summoned DEA agents, he was acting as 'an instrument or agent' of the DEA." *Id.* at 791. As such, the district court suppressed the evidence. *Id.*

On appeal, the *Walther* court focused on (1) the government's knowledge and acquiescence, and (2) the intent of Rivard in performing the search. *Id.* at 792. In finding that Walther had met "the government's knowledge and acquiescence" requirement, the court explained:

> We are also satisfied that Rivard's *prior experience with the DEA* provides proof of the government's acquiescence in the search. While the DEA had no prior knowledge that this particular search would be conducted and had not directly encouraged Rivard to search this overnight case, it had certainly encouraged Rivard to engage in this type of search. Rivard had been rewarded for providing drug-related information in the past. He had opened Speed Paks before, and did so with no discouragement from the DEA. The DEA thus had *knowledge of a particular pattern of search activity dealing with a specific category of cargo*, and had acquiesced in such activity.

*Id.* at 793 (footnote omitted) (emphases added).

The *Walther* court made clear that its holding hinged on the particular facts before it:

> *We emphasize the narrowness of our holding.  It is dependent upon the trial court's finding of extensive contact between Rivard and the DEA* and its finding on Rivard's motivation for opening the overnight case.  The DEA either knew or should have known that Rivard had made it a practice to inspect Speed Paks, and had acquiesced in that practice.  We do not by this opinion diminish the duty of any private citizen to report possible criminal activity, nor do we frown upon the use of paid informants.  We merely hold that the government cannot knowingly acquiesce in and encourage directly or indirectly a private citizen to engage in activity which it is prohibited from pursuing where that citizen has no motivation other than the expectation of reward for his or her efforts.

*Id.* (emphasis added).

There are several significant facts that distinguish this case from *Walther*.  First, Mr. Kama made clear in his testimony that the June 7, 2013 morning meeting with Special Agent Pent was the first time that he and Mr. Kahalewai had met with Special Agent Pent or anyone from the FBI.  Unlike the situation in *Walther*, there was no "extensive contact" between the FBI and the Atooi marshals prior to the search at issue.  In fact, there was no prior history at all.  Second, the Atooi marshals did not, at any time, become informants for or receive rewards from the FBI, as was the case in *Walther*.  Third, Special Agent Pent, the FBI, and other state and federal law enforcement authorities had no "knowledge of a particular pattern of search activity dealing with a specific category of cargo[.]"  *Id.*  Accordingly, the reasons for requiring the type of affirmative discouragement urged by the defense here are absent from this case, and the Court is reluctant to

19

extend or impose a new affirmative obligation on law enforcement that is nowhere supported by this Circuit's case law.

In sum, the Court finds that law enforcement did not have knowledge of or acquiesce in the Atooi marshals' warrantless search. Because the initial search of the crate was conducted by Messrs. Kama, Kahalewai, and Christiansen as private individuals, there was no Fourth Amendment violation. Additionally, the Court upholds the Magistrate Judge's probable cause determination that resulted in the issuance of the two search warrants at issue, based in part on the discovery of the marijuana inside the crate by the private individuals.

## II.   <u>Toyofuku Consented to the Search of His Cell Phone</u>

Toyofuku contends that the warrantless search of his cell phone violated his Fourth Amendment rights. Relying on *Riley v. California*, 134 S. Ct. 2473 (2014), Toyofuku argues that a search of an arrestee's cell phone does not fall within the search-incident-to-arrest exception, and that the search of a cell phone requires a warrant or an established exception to the warrant requirement. Dkt. No. 55-1 at 16-17.

In response, the government argues that the search of Toyofuku's cell phone was consensual. As such, the government argues that the search did not violate his Fourth Amendment rights. The Court agrees.

A search conducted pursuant to valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) (holding that a suspect's voluntary consent may justify a warrantless search). Whether a particular consent to search is voluntary depends on the totality of the circumstances. *Id.*at 227. While no single factor is dispositive, factors that courts consider include: (1) the consenting individual's knowledge of the constitutional right to refuse consent; (2) the consenting individual's age, intelligence, education and language ability; (3) the degree to which the consenting individual cooperates with the police; (4) the consenting individual's attitude about the likelihood of the discovery of the contraband; and (5) the length of detention and the nature of the police questioning, including any police threat of physical punishment. *Id.* at 226.

Based on the totality of the circumstances, the Court concludes that Toyofuku voluntarily consented to the search of his cell phone. Although Toyofuku was in custody when he was asked whether he consented to the search of his cell phone, that one factor is not dispositive of the issue. Rather, the other factors demonstrate that his consent was voluntary and not in response to any express or implied assertion of authority. It is undisputed that Toyofuku had received *Miranda* warnings, that he was not handcuffed or threatened with harm, and that the officers did not have their weapons drawn when Toyofuku was asked about searching his cell phone. There was no evidence or even argument that

21

Toyofuku lacked the capacity or competence to understand his rights or the officers' requests, and Toyofuku's demeanor was described as "cooperative."  In addition, Toyofuku was not told that a search warrant would be obtained if he refused consent.

Because Toyofuku's consent to search his cell phone was voluntarily given, the Court upholds the search of the cell phone and all evidence obtained directly or as a result therefrom.

## CONCLUSION

Toyofuku's Motion to Suppress (Dkt. No. 55) is hereby DENIED.

IT IS SO ORDERED.

DATED:  September 21, 2015 at Honolulu, Hawai'i.



_____
Derrick K. Watson
United States District Judge

United States v. Toyofuku; CR 14-00032 DKW; ORDER DENYING
DEFENDANT TOYOFUKU'S MOTION TO SUPPRESS

22