IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>JOHN ZACHARY KATSU TOYOFUKU,<br><br>        Defendant. | CR. NO. 14-00032 DKW<br><br><br>**ORDER DENYING DEFENDANT'S RENEWED MOTION TO SUPPRESS** |

## ORDER DENYING DEFENDANT'S RENEWED MOTION TO SUPPRESS

Defendant John Zachary Katsu Toyofuku is charged with knowingly and intentionally attempting to possess with the intent to distribute fifty (50) kilograms or more of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

On September 21, 2015, this Court denied Toyofuku's Motion to Suppress. In pertinent part, the Court found no Fourth Amendment violation where private citizens seizing the marijuana for which Toyofuku was indicted neither acted as an instrument nor agent of federal law enforcement.   A year later, on September 20, 2016, this Court agreed to re-open Toyofuku's Motion based on allegedly new

1

evidence that the same private citizens who—without a warrant—opened the crate

containing the marijuana destined for Toyofuku did so at the behest of *local* law

enforcement.

Having now heard and considered the additional testimony, evidence, and

argument proffered by the defense on October 26, 2016, the Court DENIES

Toyofuku's renewed Motion to Suppress.   The private citizens at issue here—

"marshals of the Polynesian Kingdom of Atooi"[1]—did not act as the instruments or

agents of either federal *or local* law enforcement.   Accordingly, the Atooi

marshals' search and ensuing seizure of the marijuana did not violate the Fourth

Amendment, and Toyofuku's Motion is DENIED.

## BACKGROUND

### I.   2015 Evidentiary Hearings and Order

The Court heard Toyofuku's first Motion to Suppress on August 24, 2015,

September 8, 2015, and September 11, 2015.   Three witnesses testified: Federal

Bureau of Investigation ("FBI") Special Agent Timothy Judah Pent, Honolulu

Police Department ("HPD") Officer Darren Lee, and Atooi Marshal Samson Kama.

Collectively, their testimony focused on a series of events on June 7, 2013,

beginning with an unscheduled meeting between Special Agent Pent, Kama, and a

---

[1]The Polynesian Kingdom of Atooi is a Polynesian sovereignty group, and the marshals of the
Kingdom of Atooi purport to be the law enforcement arm of the Kingdom.

second Atooi Marshal Kimokeo Kahalewai (also known as Timothy Troxell). According to Toyofuku, the two Atooi Marshals acted as agents, and at the direction, of Special Agent Pent when later searching the crate containing the marijuana referenced in the Indictment without a warrant, violating Toyofuku's Fourth Amendment rights, and mandating the suppression of the evidence.

The testimony from this series of hearings in 2015 revealed that, during the morning of June 7, 2013, Kama and Kahalewai made an unsolicited attempt to meet with the FBI Special Agent-in-Charge ("SAC") in order to introduce themselves for the purpose of building a law enforcement relationship with the FBI.   Appearing at the FBI field headquarters in Kapolei, Kama and Kahalewai met Special Agent Pent, rather than the SAC, outside the building security checkpoint for approximately ten minutes.   During the meeting, Kahalewai showed Special Agent Pent a badge, which displays the words "Hawaii Federal Marshal," and contains a circular seal, which displays the words, "The Polynesian Kingdom of Atooi."   *See* 2015 WL 5601851, at *2.

Special Agent Pent confirmed that Kama and Kahalewai, whom he had never previously met nor been aware of, wanted to build a relationship with the FBI. Kama and Kahalewai described the Kingdom of Atooi and their role within the Kingdom, but did not mention work on any investigation generally, much less work

3

that they were doing on any drug investigation specifically.   Special Agent Pent concluded the brief conversation by shaking the two men's hands, giving them his business card, and telling them politely, as he would have to any other citizen, that they could call him if they had any information in which the FBI might be interested. *See* 2015 WL 5601851, at *2.

Kama testified that several hours after meeting with Special Agent Pent on June 7, 2013, he and Kahalewai received a call from an Atooi citizen, Clint Christiansen, a driver for Express Movers.   Christiansen reported that he was being followed.   As a result, Kama and Kahalewai arranged to meet Christiansen in Kunia.   Kama testified that when they arrived, their primary concern was for the safety of both Christiansen and themselves.   Christiansen further reported that he suspected the crate he was carrying in the bed of his delivery truck contained drugs and that might be the reason he was being followed.

Kama testified that one of them then opened the crate in Christiansen's truck and found it to contain marijuana.   Kama took a photo of the contents of the boxes within the crate, and texted the photo to Special Agent Pent on his cell phone.   *See* 9/8/15 Tr. at 12-14 (Dkt. No. 110).   Kama testified that he then followed up the photo by calling Special Agent Pent and other law enforcement agencies for immediate assistance.   Despite these efforts, according to Kama, it took "give or

take two hours" for law enforcement to arrive.   9/8/15 Tr. at 14.   When law enforcement officials did arrive, Kama recalled speaking to HPD Sergeant Apollo Chang.   Kama testified that he spoke to Sergeant Chang on the scene in Kunia and told him, "we just wanted to give the info to the rightful authority," and that "Our intent was safety for the citizen first."   9/8/15 Tr. at 15.   Kama made no mention at the 2015 evidentiary hearings of any telephone calls between himself and Sergeant Chang earlier that day.

On cross-examination, Kama hedged on how the crate came to be opened. He testified that Christiansen first told him there was marijuana in the crate upon arriving at the scene in Kunia.   Kama did not recall how Christiansen came to suspect the contents of the crate contained drugs, nor did Kama recall when the crate was first opened, or which one of the three of them opened it.   He acknowledged the crate could have been opened before he and Kahalewai arrived.   9/8/15 Tr. at 15-17. The government then questioned Kama regarding his attempts to reach law enforcement officials and any instructions he may have received from them:

> Q:   Agent Pent didn't tell you to open the box, did he?
>
> A:   Agent who? Pent?
>
> Q:   Judah Pent.
>
> A:   Judah Pent, no.

Q:     And Officer Apollo Chang was with the Honolulu Police
       Department.

A:     Yes.

Q:     He came later after you called Judah Pent?

A:     I did the calling to HPD –

Q:     Right.

A:     -- followed up by narco/vice, followed up by the DEA,
       followed up with the FBI.   And all we did was try to do
       the right thing and turn it over to the proper authorities.

Q:     Okay.   Mr. Kama, the first person you called when you
       got to Kunia to talk to Clint was FBI Agent Pent?

A:     Yes.

Q:     And then you called HPD?

A:     Not that I recall which way the order was but I know I
       called all four departments.

Q:     Okay.   And no one of the four departments, DEA didn't
       tell you to open the crate, did they?

A:     The DEA, no.   They didn't answer.

Q:     Okay.

A:     None of them answered.

Q:     HPD never answered?

A:     HPD never answered.

> Q:   Narco/vice never answered?
>
> A:   Narco/vice didn't answer.   It took a while for them to get back I left a message.
>
> Q:   Who did you leave a message with?
>
> A:   Narco/vice, DEA.
>
> Q:   Okay.
>
> A:   Because I don't want to hang on to it.

9/8/15 Tr. at 19-21.   Again, Kama made no mention during his September 2015 testimony of any telephone conversations on June 7, 2013 with Sergeant Chang.

Based upon Kama's equivocal September 2015 testimony, it was unclear to the Court whether Kama, Kahalewai, and/or Christiansen opened the crate and when it was opened.   In its September 21, 2015 Order, the Court concluded that "it is clear that at least one of them did, and it is undisputed that they did so without any input or direction from state or federal law enforcement authorities."   2015 WL 5601851, at *2.   The Court ruled, based upon the evidence before it, that:

> Here, it is undisputed that state and federal law enforcement authorities did not conduct a warrantless search of the crate themselves; that state and federal law enforcement did not direct the Atooi marshals to conduct the warrantless search of the crate; and that state and federal law enforcement did not have actual knowledge of the warrantless search of the crate prior to or while it was occurring.   Indeed, when Special Agent Pent initially met with Messrs. Kama and Kahalewai on the morning of June 7, 2013, the Atooi marshals did not convey any information or sign

7

that an ongoing investigation of any kind was taking place.
They did not mention any investigation, any drug investigation,
Mr. Christiansen, Mr. Toyofuku or anyone else at that time.   In
fact, from the testimony, it appears that even the Atooi marshals
had no inkling of the circumstances leading to the marijuana in
this case until sometime later that afternoon well after their
meeting with Special Agent Pent had concluded.   As such, it is
clear that the government did not "know of" the intrusive
conduct, *i.e.*, the warrantless search of the crate, until after it had
taken place.

2015 WL 5601851, at *5.   The Court further noted:

The record also reflects that the only contact that the Atooi
marshals had with law enforcement prior to the search at issue is
the ten-minute meeting with Special Agent Pent outside of the
FBI building on the morning of June 7, 2013.   Other than this
meeting, there is no evidence of the Atooi marshals having any
relationship or prior history with the FBI or any other law
enforcement agency.

2015 WL 5601851, at *5 n.3.

The issue before the Court during the initial suppression hearings in 2015 did

not involve a factual dispute regarding whether government agents directed the

private search.   It was clear that they did not.   Rather, the focus at that time was

Toyofuku's argument "that even though the government did not have advanced

knowledge of the search and did not direct the search, Special Agent Pent's actions

when he initially met with the Atooi marshals amounted to 'acquiescence,'

converting the Atooi marshals into government actors."   2015 WL 5601851, at *6.

The Court rejected Toyofuku's argument, finding that "law enforcement did not

have knowledge of or acquiesce in the Atooi marshals' warrantless search," in part because law enforcement had no hint that a search or even investigation of any kind was afoot, and in further part because law enforcement had no knowledge that the Atooi marshals had ever engaged in private searches of the sort that later occurred that day in Kunia.   2015 WL 5601851, at *6-7 (citing *Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003)).   The Court resolved that, because the initial search of the crate was conducted by "Kama, Kahalewai, and Christiansen as private individuals, there was no Fourth Amendment violation."   2015 WL 5601851, at *7.

## II.   2016 Evidentiary Hearing

In September 2016, at the urging of the defense, the Court agreed to reconsider Toyofuku's Motion to Suppress after hearing further testimony on this limited issue: whether a series of previously undisclosed telephone conversations between Kama and HPD Sergeant Chang during the afternoon of June 7, 2013 establish that HPD personnel directed the search of the crate by the Atooi marshals. In addition to the live testimony of Kama, Sergeant Chang, and HPD Officer Darren Lee, the Court received into evidence several exhibits, including Kama and Chang's cellular telephone records, and Chang's handwritten notes identifying and giving context to his cellular voice call and text records from June 7, 2013.   Def.'s Exs. A, L, and M.

### A.   __Kama's Testimony__

Kama testified that on June 7, 2013 at 1:08 p.m.,[2] he was contacted by

Christiansen, a fellow Atooi marshal and citizen, about a "suspicious crate."   Kama

and Kahalewai drove to Kunia to meet Christiansen.   At 1:36 p.m., en route to the

Kunia golf course, Kama telephoned the Kapolei police sub-station to "get

assistance" with the "suspicious crate."   He was put on hold and did not end up

speaking to anyone.   He testified that he did not know what was in the crate during

this first call to the Kapolei police station, but suspected that the crate contained

"illegal drugs."   He made another call to the same Kapolei police station at 2:03

p.m. after arriving at the golf course in Kunia, once again was placed on hold, and

ended up hanging up after five minutes.

The next call that Kama made, at 2:15 p.m., was to 911 at Kahalewai's

direction.   Kama testified that his call to 911 did not "get picked up."   Thereafter,

at 2:18 p.m., he made a call to the Aiea police station, one minute in duration.

According to Kama, the crate had not been opened at this time, and he had not seen

any evidence of narcotics.

At 2:19 p.m., Kama made a two-minute call to what he believed to be another

HPD telephone number.   He called that same number at 2:30 p.m., without success.

---

[2]This was approximately four hours after Kama and Kahelewai had concluded their ten-minute meeting with Special Agent Pent at the FBI Building.

At 2:20 p.m., 2:24 p.m., and 2:30 p.m., Kama called the DEA Hawaii Airport Task Force/Narcotics Vice office at a telephone number that he retrieved from an internet search.   He was not able to reach anyone during these calls.

At 2:32 p.m., Kama again attempted to reach someone at the Kapolei police station, without success.

At 2:35 p.m., Kama called the main line for the Pearl City police station. Kama testified that, during this six-minute call, he identified himself as a Hawaii federal marshal and said that he needed assistance with a suspicious crate.   He was told to call Sergeant Apollo Chang and given Chang's phone number.   Kama called Chang at 2:41 p.m. and identified himself as Hawaii federal marshal Kama. According to Kama, he told Chang that he had a suspicious crate and needed assistance.   At some point during this conversation, Chang asked Kama why the crate was suspicious, and Kama told Chang that he was told by another marshal that the crate might contain drugs.   Kama claims that Chang said that he needed to know what was in the crate before HPD could come to the scene.   At this point, Kama testified that he was worried "because nobody was coming," and they had been in Kunia for a couple of hours.

After their initial four-minute call, Chang called Kama back at 2:45 p.m., but Kama believes he missed this call.   He then immediately called Chang back at 2:45,

and Chang asked for their location, and said he would call back.   Chang then called

Kama at 2:55 p.m., which Kama appears to have missed, and called again at 2:58

p.m., when the men had a short conversation.   Kama testified that Chang told him

again during this call, that Chang needed to know what was in the crate before HPD

would come to the scene to provide assistance.   When Chang called Kama back at

3:34 p.m., Kama claims that he told Chang for the first time that the crate contained

marijuana.   Kama then called the FBI at 3:44 p.m., 3:46 p.m., and 3:48 p.m.,

attempting to reach Special Agent Pent, in order to inform him that the Atooi

marshals discovered marijuana in the crate.

Kama testified that it was Christiansen who opened the crate in Kunia at

Kahalewai's direction.   Kama also testified they had been authorized by the Atooi

ali'i nui Aleka Aipolani to search the crate in the name of public safety.   Kama said

he was at the Kunia golf course for "a couple of hours" before the crate was opened

and opened the crate only when Chang told Kama that HPD needed to know what

was in the crate before providing assistance.

### B.   <u>Sergeant Chang's Testimony</u>

Chang's recollection differs from Kama with respect to the content of their

initial June 7, 2013, 2:41 p.m. telephone conversation.   According to Chang, Kama

told him from the outset that the "Hawaii federal marshals" had seized or confiscated

a "pallet of marijuana" and needed assistance.   When Chang received the call from

Kama on his personal cellular phone, he was off-duty at home, but scheduled to

work later that day.   Although Kama identified himself as a Hawaii federal marshal

who obtained Chang's number from the Pearl City police station, Chang mistakenly

believed Kama to be a Deputy United States Marshal in need of HPD assistance.

Chang testified that he asked Kama why he was contacting him, rather than the DEA

or HPD narcotics division, and Kama told him that he had tried to reach those offices

and left messages, but did not get any response back.

After his initial four-minute call with Kama, Chang said he called his

supervisor, Major Saito, from the landline at his home to get permission to start his

shift early to assist the marshals with the confiscated pallet of marijuana.   Chang

then called Kama at 2:45 p.m., but Kama did not answer.   Kama immediately

returned Chang's call, and they spoke for two minutes.   According to Chang, he did

not tell Kama at any time that HPD would not come to the scene unless Kama told

him what was in the crate.

Chang then began calling other HPD officers in his Crime Reduction Unit

("CRU") regarding their availability to assist the marshals, and called several other

HPD officers with narcotics experience for their advice.   At 2:47 p.m., Chang

called Officer Charles Rezentes, a member of his CRU unit, and told him that he had

received a call from a marshal who needed assistance with a pallet of marijuana, that he had spoken with their Major, and that he received permission to assist the marshals.   He asked Rezentes to gather other officers to go to the scene in Kunia for work before their scheduled shift.   At 2:55 p.m., Chang called Kama again, but he did not answer.   Rezentes called Chang at 2:56 p.m., and they had a two-minute conversation.   Kama then called Chang at 2:58 p.m.

Chang then called HPD Officer Jared Fernandez at 3:00 p.m., Officer Dwayne Webster at 3:02 p.m., and Officer Justin Aiu at 3:05 pm.   The purpose of these calls was to let the CRU unit officers know that, if available, they would be assisting the marshals with a pallet of marijuana before they were scheduled for duty that day.

At 3:18 p.m., Chang called HPD Officer Bruce Kim in the narcotics division to ask him about the procedures for handling controlled substances under the circumstances as he understood them here – the confiscation of marijuana in a cargo shipment.   He sought Kim's advice because of his familiarity with narcotics protocol.   Chang then sent three text messages between 3:24 p.m. and 3:25 p.m. to Officer Paiva, an officer with prior work in the narcotics/vice division, to ask her if she had experience with cargo shipments containing marijuana.

14

At 3:33 p.m. and again at 3:34 p.m., Chang called Kama.   According to Kama, it was not until this 3:34 p.m. phone call that he first informed Chang that the crate contained marijuana.

At 3:39 p.m., Chang called Sergeant Horikawa, who was then assigned to the narcotics/vice department, to get his opinion on handling the confiscation of marijuana cargo.   Chang received a text from Officer Paiva at 3:42 p.m. and sent a reply text at 3:43 p.m.   He received three phone calls from a blocked telephone number, which he testified was an HPD narcotics/vice number, at 3:45 p.m., 3:58 p.m., and 4:56 p.m.

HPD officers, including Chang, were the first to arrive on the scene in Kunia between 4:00 and 4:30 p.m.   When they arrived, Chang saw a flat-bed truck with a big box on a wooden crate.   Chang spoke with Kama, who introduced himself as a marshal and showed him identification.   Chang did not immediately realize that Kama was not a U.S. Marshal and did not see Kama's Atooi marshal badge.   Kama showed Chang the open box on the crate with the marijuana inside.   Shortly thereafter, DEA and task force officers arrived and took over the investigation.

## C.   **Officer Lee's Testimony**

DEA Special Agent Richard Jones and HPD Officer Lee were among those who arrived in Kunia shortly after the HPD CRU unit officers.   Lee testified that

when he arrived at the golf course in Kunia, he believed he was meeting with U.S. Marshals who had taken possession of a crate of marijuana.   When he exchanged credentials with Kahalewai and Kama, he realized their badges were not U.S. Marshal badges and then saw that the license plates on their vehicle had Hawaii sovereignty insignia.

During Lee's initial conversation with the Atooi marshals, Jones asked Kahalewai why he opened the crate and Kahalewai responded that he had "border search authority."   Lee then asked Kama what Kahalewai meant by border search authority.   Kama responded that, as marshals of the Kingdom of Atooi, they had border search authority on any items entering the islands.   Neither Kahalewai nor Kama said during this conversation with Jones and Lee that they had been instructed or asked to open the crate by HPD.   Lee testified that, he did not know which of the Atooi marshals had opened the crate prior to his arrival, but he understood before arriving that it contained marijuana and that it had been opened prior to the arrival of law enforcement.

Thereafter, Special Agent Jones loaded the wooden crate and its contents onto his truck and drove the truck to a secure DEA storage warehouse.   Chang and the CRU unit officers accompanied Lee, Jones, and other task force officers on the controlled delivery in Manoa later that evening, which resulted in Toyofuku's arrest.

16

## **DISCUSSION**

Toyofuku renews his motion to suppress evidence of the marijuana that the government seized as a result of the warrantless search and seizure by the Atooi marshals on June 7, 2013.   Toyofuku's motion primarily concerns whether the Atooi marshals, Kama and Kahalewai, were "government actors" for purposes of the Fourth Amendment.   After careful consideration of the evidence, the authority and arguments presented, the Court concludes that the search conducted by the Atooi marshals was a private search that did not violate the Fourth Amendment.

In carefully assessing the testimony of the witnesses, including the substance of the testimony as well as the demeanor and manner in which the witnesses testified, the Court finds the testimony of Sergeant Chang and Officer Lee to be credible and consistent with the other evidence in the record, including the cellular telephone records, as to material details.   As discussed more fully below, the Court does not find the October 26, 2016 testimony of Kama to be credible on the specific issue of when he first notified law enforcement that the crate contained marijuana, and whether the Atooi marshals first opened the crate at the direction of Sergeant Chang, nor does the Court find Kama's testimony to be consistent with his September 7, 2016 Declaration or September 8, 2015 testimony to the Court.

## I.      Legal Framework For Determining Whether A Private Search Implicates The Fourth Amendment

The Fourth Amendment applies only to searches and seizures that are the product of government action.   *Walter v. United States*, 447 U.S. 649 (1980). Ordinarily, a search conducted by a private party cannot violate the Fourth Amendment.   Fourth Amendment interests, however, are implicated where the private individual acts as an instrument or agent of the government.   *United States v. Jacobsen*, 466 U.S. 109, 115 (1984); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989) ("Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government.").

To determine whether a private party's search implicates the Fourth Amendment, courts consider two critical factors: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends."   *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (quoting *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)).   When challenging such a search, the defendant bears the burden of establishing both prongs.   *See United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994).

18

Here, there is no apparent dispute with respect to the second prong – the Atooi marshals intended to assist law enforcement efforts when they brought the marijuana to the attention of authorities on June 7, 2013.   Although there was testimony at the evidentiary hearings in 2015 that Kama and Kahalewai were concerned with the safety of their Atooi citizen, Clint Christiansen, there is no dispute that the Atooi marshals, and Kama, in particular, contacted multiple federal and local law enforcement agencies with jurisdiction over drug enforcement matters in order to assist law enforcement, receive guidance on the handling of the crate, and "to do the right thing."   Kama's motivation is buttressed by the uncontroverted purpose of the Atooi marshals' meeting with FBI Special Agent Pent that very morning.[3] Accordingly, the Court focuses its analysis on the first prong.

---

[3]With respect to the second prong, the Court previously determined that the Atooi marshals intended to assist law enforcement, reasoning as follows:

> Mr. Kama testified that his primary goal when he and Mr. Kahalewai met with Mr. Christiansen was the safety of Mr. Christiansen, who felt that he was "being followed."   Mr. Kama's secondary goal was "to do the right thing."   Mr. Kama explained that after discovering marijuana in the crate, he contacted various federal and local law enforcement agencies with responsibility over drug crimes.   As a result, although perhaps a secondary goal, the Court finds that the Atooi marshals intended to assist law enforcement when they, together with Mr. Christiansen, opened the crate and cut open one of the boxes inside the crate.
>
> The record reflects that Mr. Christiansen believed the crate contained illegal drugs based on what he described to Officer Lee as suspicious activity that he had observed when he attempted to deliver the crate.   Mr. Christiansen communicated this information to the Atooi marshals, who arranged to

19

As to the first prong, "[p]olice officers may not avoid the requirements of the Fourth Amendment by inducing, coercing, promoting, or encouraging private parties to perform searches they would not otherwise perform." *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014).   "Police officers may be liable for a private party's search when the police "ordered or were complicit in the search[].'" *Id.* (quoting *United States v. Sparks*, 265 F.3d 825, 831 (9th Cir. 2001) *overruled on other grounds by United States v. Grisel,* 488 F.3d 844 (9th Cir. 2007) (en banc)).[4]

---

meet Mr. Christiansen at Royal Kunia Country Club.   Although Mr. Kama testified that the safety of Mr. Christiansen was his primary concern, that goal would have been achieved once he and Mr. Kahalewai arrived on scene and met with Mr. Christiansen without anyone else present or apparently following.   With the safety goal in the rear view mirror, Mr. Kama and/or Mr. Kahalewai nonetheless proceeded to cut open one of the boxes and observed what appeared to be marijuana.   The Court finds that the intent behind the search of the crate was motivated, at least in part, by the Atooi marshals' desire to further law enforcement ends.

2015 WL 5601851, at *5.

None of the testimony or evidence received at the October 26, 2016 hearing alters the Court's prior view on this issue.   The Court thus re-affirms its earlier determination that the Atooi marshals intended, at least in part, to assist law enforcement efforts.

[4] *See also United States v. Benoit*, 713 F.3d 1, 9 (10th Cir. 2013) ("We have additionally held that 'knowledge and acquiescence . . . encompass the requirement that the government agent must also affirmatively encourage, initiate or instigate the private action.' '[I]f a government agent is involved merely as a witness, the requisite government action implicating Fourth Amendment concerns is absent.'   Police must, in 'some affirmative way . . . instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment.'" (quoting *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996)).

Because the evidence here illustrates that government agents neither directed, encouraged, acquiesced in, nor were otherwise complicit in the Atooi marshals' intrusive conduct, no Fourth Amendment violation occurred.

## II.   Whether The Atooi Marshals Were The Instruments Or Agents Of Law Enforcement At The Time Of Their Search

### A.   Determination Of Facts Supported By The Record

The parties dispute certain material facts, particularly the content of Kama's telephone conversations after the Atooi marshals were first contacted by Christiansen about the "suspicious crate" during the afternoon of June 7, 2013. After carefully observing the demeanor of the witnesses, and evaluating the substance of their testimony together with their candor and manner of testifying, the Court finds that Sergeant Chang was credible and his version of facts most consistent with the other evidence in the record.   His demeanor was earnest and straightforward, and he appeared at all times to answer questions based on his truthful recall of events.   The same cannot be said of Kama.   His testimony at the October 2016 hearing was significantly aided by the use of his September 7, 2016 Declaration, as he was not able to independently recall the sequence of events or the law enforcement groups he attempted to reach on the afternoon of June 7, 2013. Moreover, at times, he appeared to be testifying in a manner that he believed was consistent with the version of events presented by the defense.   Based upon its

21

review of the entire record, the evidence, and the testimony presented at the hearings, the Court finds the following facts supported by the record.

On June 7, 2013 at 1:08 p.m., Kama was contacted by fellow Atooi marshal Christiansen about a suspicious crate.   While driving with Kahalewai to the golf course in Kunia, Kama began making a series of calls to law enforcement agencies to get assistance.   He testified that he did not know what was in the crate at this time, but suspected that the crate contained illegal drugs.   He first called the Kapolei police station at 1:36 p.m., but was put on hold and did not speak to anyone. He again called the Kapolei police station at 2:03 p.m. after arriving at the golf course in Kunia, and once again was placed on hold and hung up after five minutes.

Once at the Kunia golf course, Kama called 911 at 2:15 p.m.   He did not speak to anyone, as the call was not answered.   At 2:18 p.m., Kama called an Aiea police station, and at 2:19 p.m., he called another HPD police station without reaching anyone.

Kama then called the DEA Hawaii Airport Task Force/Narcotics Vice office three times at a telephone number that he retrieved from an internet search at 2:20 p.m., 2:24 p.m., and 2:30 p.m.   He did not speak to anyone during these calls.   At 2:30 p.m., he called another HPD number, followed by a 2:32 p.m. attempt to reach someone at the Kapolei police station, both without success.   A logical and the most

reasonable inference to draw from Kama's emergent call to 911 and the rapid succession of multiple calls to at least six different law enforcement agencies focused on drug crimes is that Kama *knew*, not merely suspected, that the crate contained marijuana by the time he arrived at the Kunia golf course.   And the only way he would have known that is if the crate had been opened by that time.

At 2:35 p.m., Kama reached someone at the Pearl City police station, who gave him Sergeant Chang's personal cellular phone number.   Kama called Chang at 2:41 p.m., and identified himself as Hawaii federal marshal Kama.   Chang was off-duty at the time.   There is no dispute that Chang mistakenly understood Kama to be a U.S. Marshal.   Although Kama claims that he told Chang that he had a suspicious crate and needed assistance, Kama also testified that when asked by Chang, what made the crate suspicious, Kama responded that he was told by another marshal that the crate might contain drugs.[5]

Chang credibly testified that Kama unequivocally told him during their first conversation at 2:41 p.m. that he and Kahalewai had confiscated a pallet of marijuana and needed assistance.   Moreover, Chang convincingly explained that he

---

[5]Kama testified at the October 26, 2016 hearing that it was Christiansen who opened the box on the crate at Kahalewai's direction.   Kama also testified on October 26, 2016 that they had called ali'i nui Aleka Aipolani, the person whom they consider the Atooi King, and obtained his authority to search the crate in "the name of public safety."   At the prior September 8, 2015 hearing, however, Kama testified that he did not know when or how the crate was opened, but that Christiansen told him it had been opened and contained marijuana.   9/8/15 Tr. at 18.

inquired of Kama why he had contacted Chang, an off-duty CRU officer at home on his personal number, rather than the DEA or HPD narcotics/vice division, and Kama told him that he had tried to reach those agencies and left messages, but did not get any response back.

Chang's version of this initial 2:41 p.m. telephone call is supported by the actions he took immediately following the call: he began telephoning CRU officers who were not yet on duty to check on their availability to assist the marshals with the seized marijuana.   At 2:47 p.m., Chang called Officer Rezentes, told him that he had received a call from a federal marshal who needed assistance with a pallet of marijuana; that he had spoken with their Major; and that he received permission to assist the marshals.   He asked Rezentes to gather additional officers to go to the scene in Kunia earlier than their scheduled shift.   Chang made similar calls to Officer Fernandez at 3:00 p.m., Officer Webster at 3:02 p.m., and Officer Aiu at 3:05 pm.   He then reached out to three officers with narcotics/vice experience to get their advice on handling marijuana in cargo shipments.   At 3:18 p.m., he called Officer Kim in the narcotics division.   Chang sent three text messages to Officer Paiva at 3:24 p.m. and 3:25 p.m.   At 3:39 p.m., he called Sergeant Horikawa.   All of these communications, which are supported by Chang's cellular telephone records and were made in response to his initial call with Kama, support Chang's

recounting of the 2:41 p.m. call – that, in fact, Kama told him that Hawaii federal marshals confiscated or seized a pallet of marijuana and needed assistance.   Chang would not have been marshaling his Crime Reduction Unit team at that time, and reaching out to three different HPD narcotics officers, if he was in the dark as to the contents of the crate until 3:34 p.m., as the defense asserts.

Chang's version of events is also supported by Officer Lee's testimony that Kahalewai and Kama told Special Agent Jones and Lee that the crate was searched pursuant to the Atooi marshals' border search authority.   Neither Kahalewai nor Kama mentioned any direction or request from or consent by HPD before opening the crate at the golf course when initially questioned by Jones and Lee at the scene. Lee credibly testified that, although he did not know which of the Atooi marshals had opened the crate, he had been told prior to arriving at the golf course that it contained marijuana.

Considering the totality of the circumstances, and concluding that Chang and Lee provided credible testimony, the Court finds that Chang's recounting of the 2:41 p.m. telephone call is the more plausible version of events.   Accordingly, the Court credits Sergeant Chang's testimony that Kama told him during the 2:41 p.m. telephone call that "Hawaii federal marshals" had seized or confiscated a pallet of marijuana and were in need of assistance.   That is, the Court does not find credible

the contrary testimony suggesting that the Atooi marshals did not open the crate and learn of its contents until after they contacted Sergeant Chang, and he suggested that they do so.

### B.   The Private Search Did Not Violate The Fourth Amendment

It is undisputed that state and federal law enforcement authorities did not conduct a warrantless search of the crate themselves.   As noted previously, to establish that the Atooi marshals' search implicates the Fourth Amendment, Toyofuku must demonstrate both that (1) the government knew of and acquiesced in the intrusive conduct; and (2) the Atooi marshals intended to assist law enforcement efforts.   *See United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994).

As to the first prong, having determined that Sergeant Chang did not directly or impliedly request that Kama or the Atooi marshals open the crate, and that the Atooi marshals had, in fact, opened the crate and learned of its contents before contacting anyone at HPD that afternoon, the Court finds that the Atooi marshals could not have been acting as the instruments or agents of the government at the time of their private search.   *See Reed*, 15 F.3d at 93; *Cleaveland*, 38 F.3d at 1093.   *See also Brokers' Choice of Am., Inc. v. NBC Universal, Inc*., 757 F.3d 1125, 1145 (10th Cir. 2014) ("Both prongs must be satisfied considering the totality of the circumstances before the seemingly private search may be deemed a government

26

search.   [K]nowledge and acquiescence . . . encompass the requirement that the

government agent must also affirmatively encourage, initiate or instigate the private

action.") (some citation and quotations signals omitted).

## CONCLUSION

Based upon the foregoing, Toyofuku's renewed Motion to Suppress is

DENIED.

IT IS SO ORDERED.

Dated:   December 5, 2016 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

United States v. Toyofuku; CR 14-00032 DKW; **ORDER DENYING
DEFENDANT'S RENEWED MOTION TO SUPPRESS**